Filed 6/24/26  Toma v. Superior Court CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| DEEN TOMA, | D087700 |
| Petitioner, | (Super. Ct. No. SCD309607) |
| v. | |
| THE SUPERIOR COURT OF SAN DIEGO COUNTY, | |
| Respondent; | |
| THE PEOPLE, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDING on petition for writ of mandate.  Daniel B. Goldstein, Judge.  Relief granted.

Jo E. Super, Chief Deputy Public Defender and Troy A. Britt, Deputy Public Defender for Petitioner.

Summer Stephan, District Attorney, Linh Lam, Chief Deputy District Attorney, Valerie Ryan and Emmaline Campbell, Deputy District Attorneys for Real Party in Interest.

No appearance for Respondent.

## INTRODUCTION

Deen Toma sought to have his criminal case diverted pursuant to Penal Code[1] section 1001.36 so he could seek treatment for several diagnosed mental health disorders. The trial court found he met all eligibility and suitability prerequisites for mental health diversion except one. The court found he posed an unreasonable risk of danger to public safety because there was "a likelihood he could commit a super strike." The court denied Toma's motion solely for this reason.

We conclude the trial court abused its discretion. It failed to follow the governing statute's directions. Its conclusion that Toma posed an unreasonable risk to public safety, as defined by section 1001.36, subdivision (c)(4), was unsupported by substantial evidence. Accordingly, we issue the requested writ of mandate and direct the court to grant Toma's motion for mental health diversion.

## PROCEDURAL AND FACTUAL BACKGROUND

According to testimony at the preliminary hearing, on September 7, 2025, around 4:00 a.m., K.G. contacted the San Diego Police Department about a burglary at a dentist's office on Point Loma Boulevard. K.G. lived across the street and had been woken up by the sound of someone on her patio. She looked through the window and saw a man, later identified as Toma, wearing dark clothing, a hat, and a bandana. He asked her for help, and she told him to go away. After he left, she heard glass breaking at the dentist's office, and she saw a man with similar build go into the building.

When police officers arrived at the dentist's office, Toma barricaded himself in a small bathroom and refused to follow police commands to come

---

[1]     Undesignated statutory references are to the Penal Code.

2

out.  SWAT team officers were called and arrived about an hour later, making the total number of officers about 10.  They began giving verbal commands to Toma, stating (more or less) as follows:  " 'This is the San Diego Police Department.  You're under arrest.  Please come out with nothing in your hands, towards the sound of my voice.  If you don't follow our commands, a K-9 will be utilized and/or we will be utilizing pepper ball ammunitions.' "

In response, Toma "would intermittently open the door very slightly for maybe a second or two, look outside, and close the door."  When the door was open "for a slight moment," one of the SWAT officers shot a pepper ball into the bathroom.  "[P]epper ball dust" from a pepper ball makes it "very uncomfortable" for a suspect to be inside a small room.  "They start coughing . . . snot, they start crying," and "it's very itchy."  Toma still did not come out, but officers could see he was wearing gloves and had something in his hand.

The SWAT officers then used a "department-issued door knocker" to break open the bathroom door.  The K-9 was given a "bite command," and entered the bathroom first.  The officers followed a few seconds later.

When officers entered, Toma was holding a screwdriver in his right hand and the K-9 had that same hand in his mouth.  The officers began shouting, " 'He has a screwdriver,' so everyone was aware Toma was armed."  One of the officers shot Toma with a nonlethal, "40 millimeter foam round," and he dropped the screwdriver.

The K-9 handler was one of the last officers to enter the bathroom.  When he came in, he noticed the K-9 was "off bite," meaning he had released Toma's hand.  This was unusual because K-9s are trained to "bite and hold in the same position" and to not release from a bite until given a signal by the

handler. As the K-9 handler approached the K-9, he saw he had "a pretty large laceration on the top of his head between his eyes."

After Toma dropped the screwdriver, officers dragged him out of the bathroom. He was handcuffed and placed in a "wrap device," which is used to prevent noncooperative suspects from kicking and hurting officers after the suspect has been handcuffed.

The K-9 was taken to an emergency veterinarian. His injury was stitched internally and externally and he "took about a week off." None of the police officers who participated in Toma's arrest saw how the K-9 had been injured.

On September 9, 2025, the San Diego County District Attorney charged Toma with exhibiting a weapon with intent to resist arrest (§§ 417.8, 12022, subd. (b)(1); count 1), resisting arrest with a personal use deadly weapon enhancement (§ 69; count 2), animal cruelty (§ 597, subd. (a); count 3), interference with a police animal causing serious injury (§ 600, subds. (a) & (c); count 4), and vandalism (§ 594, subd. (a)(b)(1); count 5). After the preliminary examination, he was held to answer on all counts and the enhancement allegation.

On January 13, 2026, Toma filed a motion for mental health diversion under section 1001.36. The People opposed the motion on January 27, 2026. The trial court denied it on February 4, 2026.

DISCUSSION

In 2018, the Legislature enacted section 1001.36 to create a diversion program for criminal defendants with diagnosed mental health disorders. (*Sarmiento v. Superior Court* (2024) 98 Cal.App.5th 882, 890 (*Sarmiento*).) "Diversion allows for the suspension of criminal proceedings and potential dismissal of charges upon successful completion of mental health treatment."

4

(*Ibid.*)  "By its terms, section 1001.36 was designed to encourage trial courts to broadly authorize pretrial mental health diversion, providing treatment for qualifying mental disorders that result in criminal behavior."  (*Id.* at p. 887.)

The decision whether to grant diversion is a two-step process.  First, the court determines "if the defendant satisfies the eligibility requirements . . . set forth in [section 1001.36,] subdivision (b)."  (§ 1001.36, subd. (a).)  Defendants are eligible if they have been diagnosed with a recognized mental disorder that was a significant factor in the commission of the criminal offense with which they are charged.  (*Id.*, subd. (b).)

Second, the court determines if "the defendant is suitable for . . . diversion under the factors set forth in [section 1001.36,] subdivision (c)."  (§1001.36, subd. (a).)  Those factors are:  (1) in the opinion of a qualified mental health expert, the defendant's mental disorder would respond to treatment; (2) the defendant agrees to waive their speedy trial rights; (3) the defendant agrees to comply with treatment requirements; and (4) the defendant will not pose an 'unreasonable risk of danger to public safety' as defined in sections 1170.18 and 667, subdivision (e)(2)(C)(iv)."  (*Sarmiento, supra*, 98 Cal.App.5th at p. 891.)

Finally, even when all eligibility and suitability factors are met, courts have " 'discretion to deny mental health diversion.' "  (*Sarmiento, supra*, 98 Cal.App.5th at p. 895–896.)  "But this 'residual' discretion must be exercised consistent with the principles and purpose of the governing law."  (*People v. Qualkinbush* (2022) 79 Cal.App.5th 879, 888 [cleaned up].)

Here, Toma contends the trial court erred at the second step of the process when it assessed the fourth statutory factor, whether "[t]he defendant will not pose an unreasonable risk of danger to public safety . . . if treated in the community."  (§ 1001.36, subd. (c)(4).)  We agree and grant his request for

a writ of mandate. Our review is for abuse of discretion. (*People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1147 (*Whitmill*).)

A. *"Unreasonable Risk of Public Safety" Defined*

As noted, the trial court denied mental health diversion solely on the ground that Toma was too dangerous to be treated in the community. Thus, we focus on the fourth suitability factor: Whether Toma "will not pose an unreasonable risk of danger to public safety, as defined in section 1170.18, if treated in the community." (§ 1001.36, subd. (c)(4).)

Under section 1170.18, the Legislature has narrowly defined 'an unreasonable risk of danger to public safety' to mean "an unreasonable risk that the petitioner will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667." (§1170.18, subd. (c).) "The violent felonies encompassed in this definition 'are known as "super strikes." ' " (*People v Moine* (2021) 62 Cal.App.5th 440, 449.) "Th[e] super strikes are murder, attempted murder, solicitation to commit murder, assault with a machine gun on a police officer, possession of a weapon of mass destruction, any serious or violent felony punishable by death or life imprisonment, or any sexually violent offenses or sexual offense committed against minors under the age of 14." (*Whitmill, supra*, 86 Cal.App.5th at pp. 1150–1151.)

By statute, when determining the risk of danger, "[t]he court may consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's treatment plan, the defendant's violence and criminal history, the current charged offense, and any other factors that the court deems appropriate." (§ 1001.36, subd. (c)(4).) A defendant who seeks diversion is not being sentenced, and so, the general

6

sentencing objectives set forth in rule 4.410 of the California Rules of Court are inapplicable. (*Whitmill, supra*, 86 Cal.App.5th at p. 1149.)

B.     *Toma's Motion for Mental Health Diversion*

Toma supported his motion for mental health diversion with a psychological evaluation report, prepared by Dr. Benedetto Brunetto, a licensed clinical and forensic psychologist. Toma also submitted a proposed treatment plan and a proposed services plan for his mental health illnesses.

According to Brunetto's psychological evaluation report, Toma reported that his father abused him physically, emotionally, and psychologically. He was also sexually abused by a male cousin who lived in the family home "during his mid-elementary school years." Toma had been diagnosed previously with psychosis and a mood disorder. He acknowledged that "medication help[ed] stabilize him." Toma had been hospitalized as an inpatient six times. He said "he likes the routine, structure, and consistency that rehabilitation facilities provide."

Toma, too, had a long history of drug abuse. He started using "cannabis and alcohol at age 10," and soon after, he started using methamphetamine. During a short marriage, he was sober from 2016 to 2020, but then "a relapse on drugs led to the end of [the] marriage." Toma had previously attempted substance abuse treatment, most recently four years ago. He told Brunetto that he could "see his life sober." He said, " 'I can. I want that. I need that.' " Brunetto described Toma as "fatigued by his lifestyle, lack of progress, and overall dysfunction."

Brunetto diagnosed Toma with post-traumatic stress disorder, bipolar-type schizoaffective disorder, stimulant use disorder, and opioid disuse disorder. In Brunetto's opinion, "Toma's mental health symptoms contributed to the commission of the charged offense. In fact, his mental

7

health symptoms appear to be the singular basis of the offenses, with no other, obvious motivation." He opined Toma's symptoms could be "successfully treated with psychotherapy, psychotropic medication, psychoeducation, and various other methods," and he was "motivated to comply with treatment as a condition of diversion." (Italics removed.)

Toma's treatment plan and proposed services plan recommended that he be referred to a "County/Medi-Cal funded Residential Treatment Program," to receive "Residential substance use treatment." (Capitalization omitted.) Upon completion of the program, he would be linked "to outpatient mental health services for continued support for his mental health and medication management if clinically indicated."

On the question of whether Toma posed an unreasonable risk of danger to public safety, Brunetto considered the circumstances of the current offense as well as those of a recent misdemeanor offense that was also pending trial. According to the police report from the misdemeanor offense, Toma had "caused a disturbance" at a store. He "would not leave, despite being told [the store] was closed. Upon contact by officers, he was described as speaking rapidly and unable to be directed. Officers suspected he was under the influence of substances due to their observations, including paranoia, incoherent speech, and constricted pupils." They arrested Toma and he was charged with criminal trespass (§ 602, subd. (m)) and being under the influence of a controlled substance (Health & Saf. Code, § 11550, subd. (a)).

Brunetto did not review a rap sheet, but "Toma was quite transparent regarding his legal history." Toma "report[ed] having been incarcerated five times, including in Texas and Arkansas, where he had relocated in attempts to overcome his addiction, though he would quickly relapse."

8

During the interview, Brunetto "found no indication of mood instability or personality dysregulation[,] . . . , nor did [he] believe [Toma] to be a danger to himself or others." Brunetto opined, "In the context of ongoing treatment and continued stability, . . . Toma will not pose an unreasonable risk of danger if treated in the community. His current charges, as well as many of his past charges, appear to be in context of mental illness, most notably substance use disorders. Therefore, by default, if his mental illness is addressed, his risk should decrease."

C.   *The People's Opposition to Mental Health Diversion*

In their opposition, the People conceded Toma was eligible for diversion, but contended he was unsuitable because he had many opportunities throughout his lengthy criminal history to address his mental health and had always failed to complete treatment. They further asserted he "[f]ailed to provide an appropriate or sufficiently detailed recommendation for a mental health treatment program." They asked that Toma be required to provide more details about the proposed program, and that any treatment plan direct that he "be placed on a SCRAM drug patch to ensure he does not consume any [illicit] substances." They also noted that Toma had not yet technically waived his right to a speedy trial.

Important here, on the question of whether Toma posed an unreasonable risk of danger to public safety, *the People expressly conceded he did not*. They provided some additional detail about his criminal background. Toma was convicted of robbery (§ 211), a strike offense (§§ 667, 1170.12), in 2007. He was convicted of felony corporal injury on a significant other (§ 273.5) in 2011. From 2019 to 2025, he was convicted of five felonies and eight misdemeanors in Texas and Arkansas, all for low-level offenses, such as "thefts[,] trespass[,] and criminal mischief." Based on this background, the

9

current felony offense, and the pending misdemeanor offense, the People concluded, "Given the limited definition of ["super strike"], the People concede this element."

D.    *The Trial Court's Ruling*

At the hearing on Toma's motion, the People withdrew their concession, and the prosecutor provided additional details to the trial court about the robbery conviction in 2007, and the domestic violence conviction in 2011. Regarding the robbery conviction, the prosecutor represented that Toma "got into an altercation" with another passenger on a city bus. Toma "demanded the victim's iPod, they fought, and then [he] brandished a screwdriver and stole the victim's hat." Regarding the domestic violence conviction, the prosecutor represented that "[Toma] beat his girlfriend after she refused to give him money," and "[s]tole her cell phone, Social Security card[,] and other personal items." The prosecutor acknowledged there was no weapon involved in the domestic violence incident. But she asserted, "[G]iven the history and given also the history that's out of state, the People are concerned with dangerousness."

She argued, "the case before the [c]ourt today is serious in nature." She explained, "In this case, [Toma] barricaded himself in a dental office, [and] there was a SWAT standoff. And what . . . was shown at the preliminary exam at least, is there is a puncture wound consistent with the screwdriver to the K-9. [¶] This is not the first time that the defendant has barricaded himself in stores or abused weapons in the commission of offenses. The [c]ourt just heard about his 211 strike and about the domestic violence incident with his ex-girlfriend."

The prosecutor continued, "Here we have an individual who is schizophrenic and who does use meth[amphetamine] and that is a concern for

10

the People based on the conduct in this case, [and] based on his criminal history." Addressing Toma's criminal history, she stated, "while the 2007 and 2011 crimes . . . are remote in time , . . there has been consistent criminal behavior since 2011, [after which] we know that he spent four years in state prison." Addressing the low-level nature of the crimes Toma committed in Texas and Arkansas, the prosecutor stated, "while those crimes appear to be for thefts and trespass and criminal mischief, the case before the [c]ourt today is serious in nature." As for her reasoning, she stated, "[I]t's impossible to predict whether someone is going to commit a super strike such as murder. [¶] The [c]ourt knows that there are murder strikes up and down these courtrooms every day where someone may not have any criminal record and, yet, they commit a murder."

Toma's defense counsel argued, "I understand there is violence alleged in this case, but I don't think that it rises to the level of . . . " '[h]e's going to commit a super strike.' " She explained, "we have an individual here who doesn't have a history of guns, doesn't have a history of having a knife or even using weapons on anybody . . . . He's not someone . . . who's shooting bullets at people or actually actively stabbing people, so . . . there's no indication that [he] is going to commit a super strike." As for his prior history, she argued, "these are instances that date back to 2007 [and] 2010. So these are remote in time." Defense counsel explained, "the fact that these incidents happened so long ago—[ ]his strike is almost 20 years old at this point—shows that he's probably less likely to commit a super strike because he hasn't shown any violence since then." Defense counsel acknowledged that dangerousness is "hard to predict," but concluded, "I just don't think . . . . Toma falls into the category of someone that the [c]ourt should consider too dangerous to be put on [d]iversion."

11

During argument, the trial court said it was "making a record" that, in its view, the analysis required to determine whether a defendant presents an unreasonable risk to public safety is problematic. The court characterized the analysis of whether a defendant presented an unreasonable risk to public safety as, "I have to know that the defendant will commit a super strike." The court explained its view:

> "How is any trial court supposed to be able to predict?
>
> "I think like, for instance, [in] domestic violence cases, if I look at all domestic violence homicides, 90 percent of them have a prior misdemeanor for domestic violence . . . . But I can't say that . . . a misdemeanor domestic violence [conviction] is indicative of somebody about to commit a super strike.
>
> "[The] problem with the forced decision about super strikes is the predictive nature it requires the trial courts to engage in. Nobody can do it."

At the conclusion of the hearing, the trial court ruled from the bench. The court rejected the People's contentions that Toma's treatment plan was inadequate and that he was unlikely to comply with it. But the court agreed with the People "on the risk of future dangerousness."[2]

---

[2] In agreeing with the prosecutor, the court decided that Toma's 2007 and 2011 convictions were not too remote to be considered. The court's decision to consider these convictions was within its discretion. As part of its reasoning, however, the court incorrectly looked to the analysis of whether to strike a strike "in a regular criminal setting" pursuant to section 1385. As previously mentioned, a defendant who seeks diversion is not being sentenced, and so, general sentencing objectives and considerations are not relevant to the analysis of whether to grant diversion. (*Whitmill, supra*, 86 Cal.App.5th at p. 1149.)

12

The court ruled:

> "Predicting a super strike is impossible. But I'll note that twice [Toma] has used a weapon. I'm assuming the facts are true. [He] pled to a robbery with a [section] 12022[, subd.] (b)(1) [enhancement], which requires the use of a weapon, and he's currently charged with the use of a weapon.
>
> "It's going to be a factual issue at trial whether or not [Toma] was the one who actually stabbed the dog, or if it was an unintentional use of the screwdriver to the dog's head.
>
> "I've . . . considered the photos in both the [d]efense and People's motions. I mean, there's no question the dog got stitches, there's no question the screwdriver caused it in my mind.
>
> "So he's used a weapon twice, he's engaged in domestic violence once, and I think there's a likelihood he could commit a super strike.
>
> "Based on all that, I'm going to deny the motion."

E.    *Analysis*

Toma contends (1) the trial court applied an incorrect legal standard when deciding whether he "will pose an unreasonable risk of danger to public safety . . . if treated in the community," and (2) there was insubstantial evidence that he will pose an unreasonable risk under the correct standard. (§ 1001.36, subd. (c)(4).) We agree the trial court erred. " 'A court abuses its discretion when it makes an arbitrary or capricious decision by applying the wrong legal standard . . . , or bases its decision on express or implied factual findings that are not supported by substantial evidence.' " (*Whitmill, supra*, 86 Cal.App.5th at p. 1147.)

13

Starting with the legal standard, section 1001.36 does not create a standard that is impossible to apply. The plain language of the statute requires a finding that a defendant will not pose an *unreasonable risk* of committing a super strike. (§§ 1170.18, subd. (c); 1001.36, subd. (c)(4).) The statute does not, as the trial court suggested, require a prediction that a defendant will not, *in fact*, commit a super strike. (§ 1001.36, subd. (c)(4).) The correct analysis thus requires assessing probabilities; not predicting outcomes, as the trial court incorrectly understood. These are two distinct types of inquiry.[3]

Courts regularly assess the risk that defendants will offend or recidivate. They assess such risk, for example, when deciding whether to impose bail, when determining the length of a prison term, and when deciding whether to grant probation. As was the case here, mental health professionals also regularly assist courts with this type of risk assessment. Based on his interview with Toma and the other information provided to him, Brunetto expressed no difficulty providing his opinion that, "[i]n the context of ongoing treatment and continued stability, . . . Toma will not pose an unreasonable risk of danger if treated in the community. His current charges, as well as many of his past charges, appear to be in context of mental illness, most notably substance use disorders. Therefore, by default, if his mental illness is addressed, his risk should decrease." The statute

---

3    The definition of "predict" is "to declare or indicate in advance [¶] *especially*: foretell." (Merriam-Webster Dict. Online (2026), <https://www.merriam-webster.com/dictionary/predict> [as of June 22, 2026 - https://perma.cc/36PS-42WC].) The meaning of "probability" is "the chance that a given event will occur." (Merriam-Webster Dict. Online (2026) <https://www.merriam-webster.com/dictionary/probability> [as of June 22, 2026 - https://perma.cc/38LA-R8BW].)

further provides explicit guidance for conducting the required risk assessment: "The court may consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's treatment plan, the defendant's violence and criminal history, the current charged offense, and any other factors that the court deems appropriate." (§ 1001.36, subd. (c)(4).)

Despite stating the task was impossible, the trial court did ultimately assess the risk that Toma would commit a super strike. As noted, the court found there was "*a likelihood*" that Toma "*could*" commit a super strike. (Italics added.) This risk assessment by the court, however, was not the one called for by the governing statute. "Unreasonable risk of danger to public safety" within the meaning of section 1001.36 means an "*unreasonable risk*" that the defendant "*will*" commit a super strike, not just a likelihood of some kind that he could. (§§ 1170.18, subd. (c); 1001.36, subd. (c)(4), italics added.) The court abused its discretion when it applied the wrong legal standard.

Applying the correct standard to the record before us, we conclude the evidence is insubstantial that Toma is too dangerous to be treated in the community on the ground that he poses an unreasonable risk of committing a super strike. Brunetto opined he does not pose an unreasonable risk. The record contains no evidence Toma has committed the types of crimes that might lead to an inference that he poses an unreasonable risk of committing "murder, attempted murder, solicitation to commit murder, assault with a machine gun on a police officer, possession of a weapon of mass destruction, any serious or violent felony punishable by death or life imprisonment, or a[ ] sexually violent offense[ ] or sexual offense . . . against minors under the age of 14." (*Whitmill, supra*, 86 Cal.App.5th at pp. 1150–1151.) The People conceded as much in their written opposition to Toma's motion in the trial

15

court.  And on appeal, they do not contend Toma is likely to commit a super strike; they contend only that he is "at risk of engaging in future violent behavior."  "A trial court abuses its discretion when the factual findings critical to its decision find no support in the evidence."  (*People v. Cluff* (2001) 87 Cal.App.4th 991, 998.)

The only question that remains is whether further proceedings are required.  We conclude they are not.  The trial court found that Toma satisfied all criteria for diversion except the public safety factor, leaving nothing further to be decided.  The People do not argue otherwise.  Under these circumstances, we will reverse the court's order with directions to grant Toma's motion unless the People present changed circumstances that warrant rehearing.  (*People v. Williams* (2021) 63 Cal.App.5th 990, 1005.)

## DISPOSITION

Let a writ of mandate issue directing respondent Superior Court to vacate its order denying Toma's motion for pretrial mental health diversion and, absent evidence of changed circumstances since the original denial that may affect his eligibility or suitability for diversion, issue a new order granting the motion. The stay of execution issued by this court shall dissolve upon issuance of remittitur.

DO, Acting P. J.

WE CONCUR:


KELETY, J.


CASTILLO, J.

17